Case 4:14-cv-03648 Document 98 Filed in TXSD on 12/01/16 Page 1 of 13

United States District Court
Southern District of Texas

**ENTERED**
December 01, 2016
David J. Bradley, Clerk

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| **NUSTAR ENERGY SERVICES, INC.,** | § | |
| | § | |
| Plaintiff, | § | |
| VS. | § | **CIVIL ACTION NO. 4:14-CV-3648** |
| | § | |
| **M/V COSCO AUCKLAND, IMO NO. 9484261,** *et al*, | § | |
| | § | |
| Defendants. | § | |

## MEMORANDUM & ORDER

The controversy in this case is over funds that have been interpleaded, and which of two parties holds a valid maritime lien. Cross-motions for summary judgment have been filed by Plaintiff NuStar Energy Services, L.P. ("NuStar") (Doc. No. 69) and Defendant ING Bank N.V. ("ING") (Doc. No. 71).

The dispute arises out of the delivery of fuel bunkers by NuStar, a physical supplier of fuel based in Texas, to four vessels owned and operated by the Chinese Ocean Shipping Group ("COSCO"). NuStar has not been paid for the delivered fuel as a result of the financial collapse of O.W. Bunker Trading and Supply A/S ("O.W. Bunker"), which until 2014 was the largest fuel supplier in the world. Two of O.W. Bunker's entities, O.W. Far East and O.W. USA, were involved in selecting and contracting with NuStar to provide the fuel in this case. Both entities have filed for bankruptcy, and except for its claimed maritime lien, NuStar has only an unsecured claim in bankruptcy.

In order to receive payment for the fuel it provided, NuStar asks the Court to find that it has a maritime lien against the COSCO vessels pursuant to the Commercial Instruments and Maritime Lien Act ("CIMLA"), 46 U.S.C. §31341-43. Both COSCO and ING oppose this

1

motion. COSCO argues that NuStar has no lien, and ING argues both that NuStar has no lien and that ING, as assignee of the O.W. Bunker groups' claims, has a lien against the COSCO vessels under CIMLA. After considering the parties' motions and responses thereto, the oral arguments, and all applicable law, the Court holds that NuStar's motion for summary judgment must be denied, while ING's motion for summary judgment must be granted.

I.  BACKGROUND

   A. Overview

This action stems from the financial collapse of O.W. Bunker Trading and Supply A/S ("O.W."), an international bunker supply conglomerate based in Denmark, which left approximately $650 million of unpaid debt and sparked litigation worldwide. Here, the agent for the COSCO vessels contracted with O.W. Bunker Far East, Inc. (the Singapore-based subsidiary of O.W. Bunker) for the delivery of fuel bunkers when the vessels docked in Houston, Texas. O.W. Far East in turn subcontracted with O.W. USA, Inc. (one of O.W. Bunker's three U.S. subsidiaries,[1] incorporated in Texas), which subcontracted with NuStar. NuStar delivered almost $2.7 million worth of fuel to the four vessels. But in 2014, before NuStar was paid, O.W. Bunker collapsed, and filed for bankruptcy protection in Denmark. O.W. Far East is undergoing liquidation proceedings in Singapore. O.W. USA has filed a voluntary Chapter 11 petition in U.S. Bankruptcy Court for the District of Connecticut, and has informed NuStar that it has no intention of paying it for the fuel provided.

NuStar filed its complaint against COSCO in December 2014. To avoid arrest of the vessels, COSCO's agent deposited the funds owed to NuStar in an escrow account, and COSCO interpleaded NuStar, ING, and several O.W. Bunker entities.

---

[1] O.W. Bunker Holding North America, Inc. is a wholly owned subsidiary of O.W. Bunker, and is the direct, sole owner of O.W. Bunker USA, Inc. and O.W. Bunker North America, Inc.

B. The Provision of Fuel to COSCO's Vessels

On four separate occasions, NuStar, a Houston-based supplier of fuel bunkers, delivered fuel to COSCO vessels. (Doc. No. 69 at 3.) The transactional history between COSCO's initial order and NuStar's ultimate delivery of fuel is complex, but is virtually identical for each vessel.

In each instance, COSCO placed an order for fuel with COSCO Petroleum ("Petroleum"), a subsidiary of COSCO. Petroleum subcontracted these orders to Chimbusco Americas, Inc., an authorized agent of COSCO. As COSCO's agent, Chimbusco was authorized to bind the vessels. (Doc. No. 82 at 2 n. 2.) Chimbusco then solicited bids from various traders, including O.W. Far East, the Singapore-based subsidiary of O.W. Bunker. (*Id.* at 3.) Chimbusco contracted with O.W. Far East to supply the fuel to COSCO's vessels. (*Id.*) O.W. Far East was not authorized by COSCO to act as its agent, and COSCO held O.W. Far East responsible for supplying the fuel. (*Id.*)

O.W. Far East then subcontracted the order to O.W. USA, and O.W. USA further subcontracted the order to NuStar. (*Id.* at 4.) COSCO did not contract with O.W. USA or NuStar, nor did COSCO direct O.W. Far East to select NuStar. (*Id.*) Although the purchase confirmation from COSCO to O.W. Far East referenced NuStar as the physical supplier, NuStar's identity was obtained solely for delivery logistics and security. (*Id.*) To that end, the president of Chimbusco sent an email to the vessels' Houston agent SeaMark, instructing SeaMark to coordinate with NuStar for delivery of the bunkers. (*Id.*)

NuStar delivered the bunkers to the vessels using a NuStar-chartered tug, and the vessel's chief engineer accepted the bunkers by signing and stamping NuStar's Marine Fuel Delivery note. (Doc. No. 69 at 5.)

### C. ING Bank

In December 2013, ING and a syndicate of lenders extended a $700 million credit facility to provide working capital for the O.W. Bunker group's global operations. (Doc. No. 71 at 2.) In exchange for the extension of this credit, O.W. Bunker assigned ING and the lenders the rights to all of O.W. Bunker's group receivables. (Doc. No. 71 at 2.) By the time O.W. Bunker declared insolvency, it had drawn on almost $650 million of those funds. (Doc. No. 71 at 2.)

## II. LEGAL STANDARD

Summary judgment is proper when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The court can consider any evidence in "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The Court must view all evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Crawford*, 234 F.3d at 902.

The party moving for summary judgment bears the burden of demonstrating the absence of a genuine dispute of material fact. *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001). If the moving party meets this burden, the non-moving party must go beyond the pleadings to find specific facts showing that a genuine issue of material fact exists for trial. *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). Summary judgment is appropriate if a party "fails to make a showing sufficient to establish the existence of an element essential to that party's case." *Celotex*, 477 U.S. at 322.

### III. APPLICABLE LAW

"The purpose of maritime liens is to enable a vessel to obtain supplies or repairs necessary to her continued operation by giving a temporary underlying pledge of the vessel which will hold until payment can be made or more formal security given." *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov, MV*, 199 F. 3d 220, 223 (5th Cir. 1999) (internal quotations omitted). Maritime liens are "largely statutorily created." *Id.* Both NuStar and ING assert that they are entitled to maritime liens under the Commercial Instruments and Maritime Liens Act ("CIMLA"), a statute that creates maritime liens for necessaries in certain instances. 46 U.S.C. §§ 31301-31343. CIMLA requires a party to show that (1) it furnished repairs, supplies, or other necessaries, (2) to any vessel, (3) upon the order of the owner or of a person authorized by the owner. *Id.* at § 31342. CIMLA defines "necessaries" as including "repairs, supplies, towage, and the use of a dry dock or marine railway," and also provides that:

(a) The following persons are presumed to have authority to procure necessaries for a vessel:

(1) the owner;

(2) the master;

(3) a person entrusted with the management of the vessel at the port of supply; or

(4) an officer or agent appointed by—

(A) the owner;

(B) a charterer;

(C) an owner pro hac vice;

(D) an agreed buyer in possession of the vessel. 46 USC §§ 31301(4) & 31341(a). *Id.* at § 31341.

5

### IV. ANALYSIS

#### A. NuStar's Right to a Lien

There is no dispute in this case that fuel is a necessary and that NuStar provided the fuel to the vessel. The sole issue is whether or not it was provided "on the order of the owner or a person authorized by the owner." What appears, at first, to be a relatively simple inquiry is complicated by the long chain of intermediaries between the vessel owners and NuStar, a pattern that is common in the maritime fuel industry. Whether or not NuStar provided fuel on the order of the owner or a person authorized by the owner depends on the nature of the relationships between the intermediate entities. *Lake Charles Stevedores, Inc. v. Professor Vladimir Popov MV*, 199 F.3d 220, 230 (5th Cir. 1999) ("it is not whether an intermediary can be expected to supply the necessaries itself that distinguishes instances in which the actual suppliers have liens, but it is rather the nature of the relationship between each pair of entities that are involved in the transaction at issue.").

Two lines of cases have developed to help courts determine the nature of the relationships: the general contractor/subcontractor line of cases, typified by the Fifth Circuit case *Lake Charles Stevedores*, 199 F. 3d 220, and the principal/agent line of cases, typified by the Ninth Circuit case *Marine Fuel Supply & Towing, Inc. v. M/V Ken Lucky*, 869 F.2d 473 (1988).

In *Lake Charles Stevedores*, the Fifth Circuit considered a claim for a maritime lien brought by stevedores who had loaded cargo onto a vessel. 199 F.3d at 221. ED&F Man Sugar, Inc. ("Man Sugar") purchased rice from Broussard Rice Mill ("Broussard"). *Id.* at 222. Broussard was responsible for providing the stevedoring services to get the rice onto the vessel, sub-chartered by Man Sugar, which would then deliver the rice to Man Sugar. *Id.* Freight forwarder Reid & Company asked Lake Charles Stevedores ("LCS") to submit a bid for loading

the rice. *Id.* LCS was told it would be working for Broussard. *Id.* LCS was awarded the contract, and subsequently loaded the vessel. *Id.* at 222-23. The vessel's master signed LCS's Activity Sheets and receipt, Man Sugar made its final payment to Broussard, and LCS sent its invoice to Broussard. *Id* at 223. Broussard failed to pay LCS and subsequently went into receivership. *Id.* The district court denied LCS a lien and LCS appealed. *Id.*

In its opinion, the Fifth Circuit described the two lines of cases regarding maritime liens. In the general contractor/subcontractor line of cases, the general contractor supplying necessaries on the order of an entity with authority to bind the vessel has a lien, but subcontractors generally do not. *Id.* at 229. In the middle-man line of cases, however, "despite what can be a large number of intermediaries, the ultimate supplier of the necessaries may obtain a maritime lien under certain circumstances." *Id.*

The court concluded that the situation presented before it was not similar to the middle-man line of cases as represented by *Ken Lucky*, but was more akin to a general contractor/subcontractor relationship. *Id.* at 230. In order to obtain a maritime lien, then, LCS needed to show that the vessel owner retained control over its selection and/or performance. Because the court found that LCS was selected by Broussard and not Man Sugar, the court affirmed the district court's denial of the maritime lien. *Id.* at 231, 233.

Representing the agency, or middle-man, line of cases is *Ken Lucky*, 869 F.2d 473. There, the vessel's subcharterer, Bulkferts, Inc., placed an order for fuel with Bulkferts' managing agent, Eurostem. *Id.* at 475. Eurostem contacted Brook Oil, and Brook Oil instructed Gray Bunkering Services to place an order for the fuel with Marine Fuel. *Id.* Once the order was placed with Marine Fuel, the vessel's local agent arranged for delivery of the supplies, and on the designated date, Marine Fuel delivered the bunkers. *Id.* The chief engineer accepted the supplies

7

with the approval of the master of the vessel. Marine Fuel then billed Gray for the supplies, but before either Gray or Marine Fuel was paid, Brook Oil went into receivership. *Id.*

The district court refused to grant Marine Fuel a maritime lien, finding that Brook Oil had no authority, presumed or implied, to subject the Ken Lucky to a lien, and that Brook Oil acted independently of Bulkferts in supplying the vessel. *Id.* at n.1 The district court found that because no agency relationship existed between Bulkferts (the sub-charterer) and Brook Oil, no presumed authority under the maritime lien act was established. *Id.* The district court also found that no implied authority existed, because the charter agreement included a no lien clause. *Id.*

On appeal, the Ninth Circuit found that it did not need to reach the district court's conclusion that no agency relationship existed between Brook Oil and Bulkferts, "because appellees have already admitted that the fuel and bunkers were sold *to Bulkferts.*" *Id.* at 477 (emphasis in original). Therefore, the panel concluded, "Marine Fuel need not establish agency between Brook and Bulkferts to fall within the scope of one entitled to a maritime lien under the Act." *Id.* Instead, the court focused on the fact that Bulkferts was authorized to bind the vessel, Eurostem (Bulkferts' managing agent) ordered the fuel, and Marine Fuel delivered the fuel to the vessel. As a result, the court found that the order originated from Bulkferts, who had presumed authority under CIMLA. *Id.*

The court also considered the master's implied authority to incur a lien against the vessel. *Id.* at 477-78. Ken Lucky conceded that the master of the ship accepted the supplies that Marine Fuel delivered, but argued that the master had no authority to accept the supplies because of a no lien clause in the charter agreement. *Id.* at 477. In finding that the master *did* have implied authority to incur a lien against the vessel, the Ninth Circuit pointed to the following sequence of events: 1) the order originated from Bulkferts; 2) Eurostem, Bulkferts' managing agent, placed

8

the order with Brook; 3) Marine Fuel received a telex from Gray confirming that the owner authorized the order; 4) before delivering the bunkers, Marine Fuel notified Fillette (Ken Lucky's local husbanding agent) of the order, and Fillette arranged for delivery of the bunkers; 5) Fillette received a telex from Bulkferts' domestic agent, stating that it was arranging for a purchase of bunkers for the ship; 6) the ship's chief engineer accepted the bunkers, acknowledging receipt, with the approval of the master; 7) the ship's master had presumed authority to incur a lien under the Act; and 8) the vessel benefited from the bunker supply. *Id.* at 478. For these reasons, the Ninth Circuit reversed the district court and found that Marine Fuel was entitled to a maritime lien. *Id.* at 474.

ING contends that two major distinctions between the facts of *Ken Lucky* and the facts presented here dictate a different outcome. First, ING argues that there is no presumed authority because neither the owners of the vessels nor the agent of the vessels (the entities with presumed authority under CIMLA) admitted that NuStar sold fuel directly *to them*, as the vessel subcharterer had admitted in *Ken Lucky*. Rather, it contends that, pursuant to the contracts, NuStar sold the fuel to O.W. USA, which sold the fuel to O.W. Far East, which sold the fuel to Chimbusco, an entity with authority to bind the vessel. Therefore, ING asserts, NuStar never sold fuel to Chimbusco, and cannot show an agency relationship with O.W. USA. ING further argues that the fact that NuStar physically delivered the fuel to the vessels is of no import, because the chief engineer of the vessel, who accepted the fuel, did not have presumed authority to bind the vessel.

The second distinction identified by ING is that NuStar never received any communication from O.W. USA confirming that the owner of the vessel had authorized the order, as Marine Fuel did in *Ken Lucky*. This omission is important because if the court

determines the entities to have general contractor/subcontractor relationships, there are limited means by which a physical supplier can still assert a lien against a vessel. One of these methods, approved of by the Ninth and Second Circuits, is to show that an entity with authority to bind the vessel directed that the general contractor hire a particular subcontractor. *Lake Charles Stevedores*, 199 F.3d at 231.

Another method, cited in *Lake Charles*, is to show that a subcontractor was identified and accepted by the vessel's owner or charterer prior to performance. *Id.* However, the Fifth Circuit has made clear that awareness on the part of the vessel's agents that a certain subcontractor would be used is insufficient to constitute authorization. *Id*. Similarly, the vessel's "acceptance of services from a supplier does not alone create a maritime lien." *Valero Marketing and Supply Co. v. M/V/ Almi Sun*, 160 F.Supp.3d 973 at 984 (E.D. La. 2016).

Because no entity with authority to bind the COSCO vessels has admitted that NuStar sold fuel directly to it, as occurred in *Ken Lucky*, NuStar must show an agency relationship between itself and an entity with authority to bind the vessel. Otherwise, the *Lake Charles* line of cases controls, and the only way for NuStar to establish a maritime lien is to fit within the narrow exceptions described by the Fifth Circuit in *Lake Charles Stevedores.*

The facts show that NuStar was not in an agency relationship with the vessel owner or any entity with authority to bind the vessel. COSCO did not authorize O.W. Far East to bind the vessels, but instead authorized Chimbusco to contract with O.W. Far East. O.W. Far East subsequently contracted separately with O.W. USA, which contracted with NuStar. Each of these contracts was separate, and no contract indicated an agency relationship with the vessel owners or any of the other entities. The general contractor/subcontractor line of cases, represented by *Lake Charles Stevedores*, therefore applies.

As described above, NuStar can still establish a lien under *Lake Charles Stevedore* if it can show that 1) an entity with authority to bind the vessels directed that the subcontractor be selected as the supplier, or 2) in some instances if the subcontractor was identified and accepted by the vessel's owner prior to performance. Unfortunately, NuStar cannot show either.

NuStar was not selected by the vessel owners or an entity with authority to bind the vessel as the physical supplier. Instead, Petroleum solicited bids from various brokers, and nominated Chimbusco to order the bunkers. Although NuStar is listed as the physical supplier on the nomination form, counsel for ING asserted at oral argument that NuStar had been selected by O.W. USA prior to the nomination form, and NuStar did not dispute this. As a result, NuStar cannot show that it was selected by an entity with authority to bind the vessel.

NuStar argues more forcefully that "[t]he fact that each COSCO Vessel's Chief Engineer accepted and signed for each delivery independently establishes NuStar's entitlement to a maritime lien." (Doc. No. 69 at 14.) However, the "ratification" argument NuStar is making was rejected by the Fifth Circuit in *Lake Charles Stevedores*. There, the plaintiff showed that the master of the vessel allowed the plaintiff on board to perform the stevedoring services and accepted those services. But the Fifth Circuit found that, under those circumstances, a maritime lien was not established. "A holding that awareness that necessaries are being supplied was sufficient, even though those necessaries were procured by an entity without authority to bind the vessel, would render the statute's authority requirement meaningless." *Lake Charles Stevedores*, 199 F.3d at 232. Furthermore, the Court held that the vessel's acceptance of the stevedoring services, by signing LCS's Activity Sheets and Mate's Receipt, was simply acceptance of the delivery of rice from Broussard (the general contractor)—not ratification of the subcontractor's services. *Id.* Similarly, the fact that the Chief Engineer signed for each fuel delivery by NuStar

11

demonstrates an acceptance of O.W. Far East's delivery, and does not establish NuStar's entitlement to a maritime lien.

The Court acknowledges the dissonance in finding that a supplier of necessaries to a vessel is not entitled to a maritime lien under a federal statute designed to make it easier for suppliers to obtain liens, and agrees with the Ninth Circuit that one of the purposes of CIMLA "is to create liens in favor of those who furnish necessaries for the vessel's operation. Permitting [a] contrived financial scheme to prevail effectively destroys the liens of suppliers and subverts the purposes of the Maritime Liens Act." *Ken Lucky*, 869 F.2d at 478. That said, CIMLA does limit which suppliers are entitled to a lien, and the Court does not feel it has a commission to expand the reach of CIMLA beyond what other courts have interpreted the statute to mean.

### B. ING's Right to a Lien

Having established that NuStar is not entitled to a maritime lien, the Court turns to ING's claim that it possesses a maritime lien. The Court finds that ING is the assignee of O.W. Far East, and as such is entitled to recover amounts owed to O.W. Far East by Chimbusco. However, ING must still show that O.W. Far East is entitled to a lien under CIMLA. It is clear that the last two requirements of the statute are satisfied—necessaries were supplied to the vessels on the order of an entity authorized to bind the vessels (Chimbusco). As to the first requirement, "a party need not be the physical supplier or deliverer to have 'provided' necessaries under the statute." *Galehead v. M/V Anglia*, 183 F.3d 1242, 1245 (11th Cir. 1999). Thus, the fact that NuStar delivered the fuel bunkers and not O.W. Far East is immaterial. The party contractually obligated to deliver the supplies is entitled to the lien, and in this case that party was O.W. Far East. Because ING can satisfy the requirements of CIMLA, the Court finds that it is entitled to a maritime line.

In addition to recovering the principal amounts of their invoices from COSCO, ING also requests interest and fees "accrued due to Chimbusco's late payment." The Court cannot grant this request. COSCO (and, it follows, Chimbusco) did not withhold payment willfully. Rather, it did not pay O.W. Far East's invoices because it had been sued by NuStar for the amount owed to NuStar by O.W. USA. Thus, COSCO, facing competing claims for payment as a result of O.W. Bunker's demise, and also facing vessel arrest by NuStar, appropriately invoked interpleader and deposited the funds in question in an escrow account. It would be inequitable to penalize COSCO for properly invoking interpleader in order to allow the legal system to determine who should be paid—a situation brought about by O.W. USA's bankruptcy and nonpayment to NuStar. Thus, the Court finds that COSCO is not entitled to any prejudgment interest.

## V.  CONCLUSION

For the reasons set forth above, ING's Motion for Summary Judgment is **GRANTED** and NuStar's Motion for Summary Judgment is **DENIED**. ING's request for prejudgment interest is **DENIED**.

**IT IS SO ORDERED**.

**SIGNED** in Houston, Texas, on this the 1st day of December, 2016.

_____
HON. KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE